IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:06CR184 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| GREGG STEVENSON, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress filed by defendant Gregg Stevenson (Stevenson) (Filing No. 37). Stevenson is charged along with co-defendants Cessar Jiminez Aguila and Steve Eugene Encinas in the Indictment with a conspiracy to distribute and possess with intent to distribute over 1,000 kilograms of marijuana in violation of 21 U.S.C. § 846. Stevenson seeks to suppress evidence obtained during, or directly or indirectly derived from, the June 21, 2006 warrantless searches of (a) Stevenson's residence located at 1 Oak Ridge Court, Pomona, New York, (b) Stevenson's person, and (c) vehicles parked at or adjacent to the property at 1 Oakridge Court on June 21, 2006.

The court held a hearing on the motion on November 20, 2006. Stevenson was present for the hearing along with his retained counsel, Jeralyn Merritt and Glenn A. Shapiro. The United States was represented by Assistant U.S. Attorney William W. Mickle. During the hearing, the court heard the testimony of Detective Sydney White (Detective White) of the New York City Police Department (NYPD), NYPD Sergeant Dennis Rodriguez (Sergeant Rodriguez), Deputy Kevin Manak (Deputy Manak) of the Douglas County Sheriff's Department (DCSD), and the defendant Stevenson. The court also received into evidence the following exhibits: a Drug Enforcement Administration (DEA) consent to search form (Exhibit 1); an advice of rights form (Exhibit 2); photographs of various items seized (Exhibits 4 - 25); a copy of the Indictment in 8:06CR184 (Exhibit 26); and a hand drawn diagram of the Oakridge cul-de-sac (Exhibit 101). A transcript (TR.) of the hearing was filed on December 1, 2006 (Filing No. 57). Stevenson submitted a post hearing brief on December 16, 2006 (Filing No. 59). The government submitted a post hearing brief on January 3, 2007 (Filing No. 62).

**FINDINGS OF FACT**

On June 21, 2006, Detective White was on duty working in a DEA drug task force which was conducting surveillance of Stevenson's residence at 1 Oak Ridge Court in Pomona, New York, approximately thirty-two miles north of New York City (TR. 14-15). Detective White arrived in the area of Stevenson's Pomona residence around 8:30 a.m. and was assisted by several other officers of the DEA task force (TR. 15). Stevenson was a target of a drug investigation involving the seizure of 221 pounds of marihuana in Nebraska (TR. 14). The New York DEA task force officers did not have an arrest warrant for Stevenson but were aware that Nebraska authorities were in the process of securing an arrest warrant for Stevenson's involvement in a conspiracy to distribute a controlled substance (TR. 17). At about the same time, DEA Special Agent Jeffrey Knight (Agent Knight) was in an Assistant U.S. Attorney's (AUSA) office in the Southern District of New York and was in the process of preparing an affidavit to obtain a search warrant to search Stevenson's residence (TR. 30 - 31; 49). 1 Oak Ridge Court was a single family residence located on a cul-de-sac (TR. 16). Detective White observed a gray Jeep vehicle and a burgundy Lexus or Infiniti in the driveway of 1 Oak Ridge Court (TR. 16). The Jeep was registered to Stevenson (TR. 16).

Around 10:00 a.m., Detective White observed a green Pathfinder arrive Stevenson's residence (TR. 19). Detective White observed Stevenson outside in conversation with the person in the green Pathfinder and Detective White moved his vehicle closer to observe (TR. 19-20). When Stevenson and the person in the green Pathfinder looked at Detective White, Detective White moved away (TR. 20). Shortly thereafter, the green Pathfinder drove from the area (TR. 20). Around 10:30 a.m., a cable repair truck arrived at the residence and Stevenson was observed to be engaged in conversation with the driver (TR. 20). The cable repair truck remained for awhile and left the area (TR. 21). Around 10:30 a.m., the burgundy Lexus left the residence (TR. 21). Thereafter, Stevenson was observed walking from the residence toward a vehicle occupied by Sergeant Rodriguez who was dressed in plain clothes and was parked at the end of the cul-de-sac about six car lengths from Stevenson's driveway in an unmarked black 2006 Durango (TR. 22).

Stevenson approached Sergeant Rodriguez's undercover vehicle and knocked on the driver's window at approximately 10:47 a.m. (TR. 68). Stevenson asked what

Rodriguez was doing in the neighborhood (TR. 68). Sergeant Rodriguez said he was looking for a house in the neighborhood (TR. 68). Stevenson said there was a house for sale up the block and that the neighborhood was a nice neighborhood (TR. 69). Following this conversation, Stevenson returned to his residence and Sergeant Rodriguez moved from this location to another location on the cul-de-sac (TR. 69).

The officers remained on surveillance in the area into the afternoon of June 21st (TR. 56). Sometime around 3:00 p.m., the surveillance team was advised by radio communication from Agent Knight that an arrest warrant had been issued for Stevenson (TR. 49). The surveillance team was waiting the issuance of the search warrant so they could execute both the arrest warrant and search warrant at the same time (TR. 56-57). Around 3:45 p.m., Stevenson left his residence in a white Escalade and drove parallel to Sergeant Rodriguez (TR. 23; 70). As Sergeant Rodriguez testified, "It looked like at 3:45 he was about to leave and the gig was up." (TR. 95). Sergeant Rodriguez radioed the surveillance team that Stevenson was headed in Sergeant Rodriguez's direction and for the surveillance team to move to Sergeant Rodriguez's location (TR. 23; 71). When Stevenson reached Sergeant Rodriguez's vehicle, Stevenson rolled down his driver's window and told Sergeant Rodriguez that Stevenson did not believe Sergeant Rodriguez was in the area looking for a house and Stevenson was going to write down Sergeant Rodriguez's license plate number (TR. 70). As Stevenson appeared to be writing down the license plate number, the other members of the surveillance team drove in and surrounded Stevenson (TR. 71). Sergeant Rodriguez got out of his vehicle and walked to Stevenson's vehicle where Sergeant Rodriguez displayed his badge and ordered Stevenson to get out of the Escalade (TR. 71). Stevenson was taken out of the Escalade and handcuffed (TR. 71). Stevenson was searched and $13,000 in U.S. currency, a wallet and ID were found on Stevenson (TR. 25; 72-73).

Stevenson was walked and placed in the rear of a minivan nearby which was driven by Investigator Boykin (TR. 72). Investigator Boykin remained in the driver's seat, and Detective White and Sergeant Rodriguez entered the rear of the minivan with Stevenson (TR. 26). Detective White advised Stevenson there was a warrant for his arrest for drug trafficking from Nebraska and advised Stevenson of his *Miranda* rights by reading from a DEA 13A, a *Miranda* rights card (TR. 26; Ex. 2). After Detective White read Stevenson the

3

*Miranda* rights, Stevenson stated he understood the rights and agreed to talk with the officers without an attorney (TR. 27-28). Detective White told Stevenson the officers were in the process of getting a search warrant for his house and asked Stevenson if he would consent to the officers searching his residence (TR. 29). Stevenson was concerned about what the neighbors would think and about his wife and kids who were in the house (TR. 29-30). Detective White told Stevenson that after he consented, the officers would have his wife come outside where they would explain the situation to her and allow the children to go across the street to a neighbor's house (TR. 30). Stevenson gave his consent to search the house and signed a consent to search form (TR. 31-32; Ex. 1). Detective White asked Stevenson what the officers would find in the house, and Stevenson told them he had about three hundred pounds of "weed," two thousand dollars in cash; and eights guns, also stating he was a gun collector (TR. 31). Detective White then called Agent Knight and informed him and the AUSA that Stevenson had verbally and in writing consented to the search (TR. 35). The AUSA told Detective White they would suspend working on the affidavit but if Stevenson asked for an attorney or told the officers to stop searching, Detective White was to stop the search and call the AUSA back (TR. 35).

Detective White called Ms. Karen Lampkin (Ms. Lampkin), Stevenson's wife, who was in the residence, and asked her to come to the minivan where he told her that Stevenson had consented to a search of the residence (TR. 36; 80-81). Ms. Lampkin did not object to search, left the minivan, and took several small children across the street to a neighbor's house (TR. 36; 80). Detective White, Sergeant Rodriguez, Agent Harvey, and Detective McGoldrick entered the residence and began a search of the residence (TR. 35). At the time of the entry at approximately 4:15 p.m., Ms. Lampkin and her father were in the residence (TR. 36). During the search, ten firearms, nine of which were loaded, were located in the residence (TR. 38-41; Exs. 4-15). Approximately four hundred pounds of marijuana, $593,000 in cash, approximately $289,000 in jewelry, and other drug related items were seized (TR. 42-45, Exs. 16-25). Much of the cash was found in safe after Detective White obtained the combination from Stevenson (TR. 103; 172). The vehicle in which Stevenson approached Sergeant Rodriguez and vehicles in the driveway were also searched.

4

Near the end of the search, a telephone call came to the residence (TR. 83). Sergeant Rodriguez spoke with the person who stated he was an attorney (TR. 84). The attorney asked what Stevenson was being charged with, where Stevenson was going to be taken, how the officers got in the residence, and if the officers had a search warrant (TR. 84). Sergeant Rodriguez told the caller that Stevenson had consented and that numerous items had been recovered from the residence (TR. 84). The caller did not ask for the search to be stopped (TR.84).

Following the completion of the search, Stevenson was driven to the New York division field office for the DEA task force (TR. 83;104). There Stevenson was interviewed by Agent Knight, DEA Special Agent David Samilo (Agent Samilo) and Deputy Manak (TR. 110). Deputy Manak had traveled from Omaha, Nebraska, to New York to assist in the investigation of Stevenson (TR. 110). Deputy Manak informed Stevenson of the Nebraska arrest warrant and Agent Knight advised Stevenson of the *Miranda* rights (TR. 112). Agent Knight read Stevenson the *Miranda* rights from a DEA 13A card and had Stevenson sign a copy of the rights following the advice (TR. 112; EX. 2). Stevenson stated he understood his rights, did not request an attorney be present, and agreed to talk with the officers (TR. 114). The interview lasted for approximately an hour during which Stevenson was generally cooperative and cordial, and the exchange between Stevenson and the officers was conversational (TR. 116-117). The interview ended when Stevenson was asked to identify various individuals who were involved in unloading marijuana at the Empire Safe Company. Stevenson stated he did not want to give them up and asked for an attorney (TR. 118). Upon Stevenson's request for an attorney, the interview was promptly terminated (TR. 118).

Stevenson testified he was having marital problems with his wife and had spent the night of June 20, 2006, at his girlfriend's house (TR. 128). Stevenson stated he arrived home around 7:00 a.m. on June 21, 2006, had breakfast, and watched several of his sons leave for school or a test (TR. 129). When he watched his son, Greg, drive away from the residence around 9:00 a.m., Stevenson observed a black Durango arrive in the neighborhood and drive around (TR. 131). After his wife left for work, Stevenson again noticed the black Durango parked in the cul-de-sac near his residence (TR. 132). Stevenson, now curious, walked down to the parked Durango and asked the driver whether

5

he was lost (TR. 132). The driver said he was looking for houses for sale (TR. 132). After Stevenson told the driver that there were no houses for sale on this block, the driver said there was one for sale on the other side and he was waiting for somebody (TR. 133). Stevenson told the driver he had not seen the Durango before and was just concerned (TR. 133). Stevenson told the driver to "have a nice day," and walked back to Stevenson's house (TR. 133). Stevenson said around 1:00 p.m. he drove away from his residence in a white Escalade and saw the Durango still in the neighborhood (TR. 135). Stevenson drove up to the Durango and asked the driver what he was still doing in the neighborhood (TR. 135). When the driver told him he was still looking for houses, Stevenson said he did not believe him and began to write down the Durango license plate number (TR. 135-36). The driver of the Durango then pulled out a badge and said "DEA," whereupon several other cars moved in around him (TR. 136). Stevenson was asked to get out of the car which he did, whereupon Stevenson was patted down and handcuffed (TR. 136). About $2,400 was removed from his pocket (TR. 136). Sergeant Rodriguez, the driver of the Durango, told Stevenson there was a warrant for Stevenson's arrest from the State of Nebraska (TR. 137). When asked where he was going, Stevenson told the officers he was going to the pet shop (TR. 138-39). The officers did not believe him and accused him of going to meet a truck with 2,100 pounds of marijuana (TR. 138). Stevenson stated the officers asked him if they could search his house, and he asked the officers if they had a search warrant (TR. 140-41). Stevenson stated the officers told him they if they had to get a warrant, they would wreck the house and send his kids to child welfare (TR. 141-42). When Stevenson said not to get his wife involved because she had nothing to do with it, the officers told Stevenson that if he gave them permission to search, his wife would not be involved (TR. 143). Stevenson said he signed a piece of paper but did not recall signing Exhibit 1 (TR. 144). Stevenson said he would not have given permission to search except for the threats to his house, his wife, and his children (TR. 144). Stevenson stated he was kept in the van and Sergeant Rodriguez came out and asked for the combination to the safe in the bedroom (TR. 147). When Stevenson hesitated, the officers said they would blow it up (TR. 147). Whereupon, Stevenson gave the officers the combination (TR. 147). Later, Stevenson stated Sergeant Rodriguez came out of the house and asked for the combination to the safe in the basement, and Stevenson gave him that combination (TR. 147). Stevenson recalled being taken to a DEA office and was asked by "Jeff" if Stevenson

6

had been read his rights, and Stevenson answered that he had (TR. 150). Jeff read Stevenson's rights again to Stevenson (TR. 150). Stevenson agreed to talk with the agents until he asked for a lawyer (TR. 151).

Stevenson acknowledged he was 43 years of age, a high school graduate with some college education, and an owner of a construction company and a cell phone store (TR. 155-56). Stevenson acknowledge prior arrests in Troy, New York, and Amarillo, Texas (TR. 156-57). He further acknowledged he was convicted of bribery and sentenced to six months imprisonment and five years of probation (TR. 156).

The court heard the testimony of all of the witnesses and observed their demeanor on the witness stand. In considering their testimony in relation to other evidence, the court credits the testimony of Detective White and Sergeant Rodriguez concerning their version of the incidents on June 21, 2006. The court discredits the testimony of Stevenson in those respects where his testimony is in conflict with Detective White and Sergeant Rodriguez.

The actual Indictment in this case was filed on June 21, 2006 at 4:14 p.m., Central Standard Time shortly after the grand jury made its return to the court (Exhibit 26). The arrest warrant for Stevenson was issued immediately thereafter. Deputy Manak testified he was advised by DEA Special Agent Paul Orduna (Agent Orduna) around 3:00 o'clock (Eastern Standard Time) in the afternoon of June 21, 2006, that the grand jury in the District of Nebraska had returned a True Bill on an Indictment involving Stevenson, that there would be arrest warrant, and that the officers in New York could arrest Stevenson (TR. 123-24).

## CONCLUSIONS OF LAW
### A. Stephenson's Arrest

Stephenson asserts he was unlawfully arrested because the officers did not possess a valid arrest warrant at the time of his arrest around 3:45 p.m. (Eastern Standard Time) on June 21, 2006, nor did they have probable cause to arrest him. The government acknowledges Stevenson was arrested at 3:45 p.m., Eastern Standard Time, approximately an hour and a half before the actual arrest warrant was issued in Nebraska. However, the government argues the officers had probable cause to arrest Stevenson on the basis of the investigation that led to the Indictment.

7

It is clear that Agent Orduna "jumped the gun" when he advised the DEA task force team in New York that the grand jury returned a True Bill on Stevenson and that it was all right for the New York team to arrest Stevenson since an arrest warrant was about to be issued in Nebraska. The only basis for Stephenson's arrest by Detective White and Sergeant Rodriguez was that an arrest warrant had been issued in Nebraska. They were, of course, misled and mistaken. While it can be said Stevenson would have inevitably been arrested on June 21, 2006, the arrest of Stevenson produced an situation where police officers searched him and the Escalade he was driving incident to his arrest. Further, Stephenson made incriminatory statements and provided a consent to search his residence while he was under arrest. If Stephenson's arrest was unlawful, evidence obtained thereafter, i.e., the evidence seized from the house and vehicles, Stevenson's statements made at the scene, and Stevenson's statements made at the DEA field office, unless purged of such taint, may be subject to suppression.

The Fourth Amendment requires an arrest be made with a valid arrest warrant or that a warrantless arrest be supported by probable cause. **See** *U.S. Const. amend. IV.*; *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003). The government has the burden to prove either a valid arrest warrant or probable cause existed at the time of the arrest. **See** *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006).

"The Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *Florida v. White*, 526 U.S. 559, 565 (1999). "Probable cause exists when, at the time of the arrest, 'the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested.'" *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (**quoting** *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003)). Therefore, whether probable cause existed for an arrest must be determined at the time of the arrest.

"Probable cause exists if the totality of the circumstances known to all officers involved at the time of the arrest 'were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Cabrera-Reynoso*, 195 F.3d 1029, 1031 (8th Cir. 1999) (citation and internal quotations omitted) and **citing** *United*

8

*States v. Amaya*, 52 F.3d 172, 174 (8th Cir. 1995) (totality of the circumstances); *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993) (court may consider collective knowledge)). Furthermore, "[i]t reasonably cannot be doubted that, in the court to which the indictment is returned, the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Ex parte United States*, 287 U.S. 241, 250 (1932). However, typically, "after-the-fact grand jury involvement cannot serve to validate a prior arrest." *Radvansky v. City of Olmsted Falls*, 395 f.3d 291, 307 n.13 (6th Cir. 2005) (citing cases).

In this case, no formal attack is made here on the composition or integrity of the grand jury. Furthermore, the defendant makes no argument the later-issued arrest warrant lacked a basis for probable cause. The arguments made by the defendant are that his arrest was executed without a warrant, and the New York officers did not possess or present independent evidence of probable cause for the arrest. There is no dispute the defendant was arrested, at 3:45 p.m. (EST), before the indictment was returned, at 4:14 p.m. (CST). In fact, Detective Rodriguez testified he would not have arrested the defendant but for his belief an arrest warrant had been issued.

It is clear on the record that no valid arrest warrant existed at the time of arrest. Moreover, the government failed to present sufficient evidence during the suppression hearing to allow the court to make an independent determination about the existence of probable cause at the time of arrest. However, the court need not evaluate the facts supporting probable cause at the time of arrest because the grand jury did so. Although the grand jury did not return the indictment until after the arrest was made, the grand jury determined the existence of probable cause based on the same evidence which existed an hour and a half earlier. Neither the quantity or quality of evidence changed between the time of the arrest and the short time until the grand jury returned the indictment. The timing of the grand jury return distinguishes this case from cases like *Radvansky*, where the indictment occurred much later in time. Accordingly, the court finds it cannot be reasonably doubted that probable cause existed, under the circumstances, at the time of the defendant's arrest.

9

Even assuming, *arguendo*, that probable cause was lacking in sufficiency, the **Leon** good faith exception would allow the admissibility of evidence in this case. Under **United States v. Leon**, 468 U.S. 897 (1984), evidence gathered pursuant to a warrant which later is found to be invalid need not be suppressed if the officers enforcing the warrant relied in good faith on its validity. In **Leon**, the Supreme Court held that "evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant 'with an objectively reasonable reliance on the magistrate's determination of probable cause.'" **United States v. LaMorie**, 100 F.3d 547, 555 (8th Cir. 1996). The Leon good faith exception applies to arrest warrants. **United States v. Johnson**, 121 F.3d 1141, 1143 (8th Cir. 1997) (officers acted in good faith when applying for order requiring appearance and later arrest warrant) (**citing Arizona v. Evans**, 514 U.S. 1, 11-17 (1995) (**Leon**, good faith exception, applies to an arrest warrant); **United States v. Teitloff**, 55 F.3d 391, 393 (8th Cir. 1995) (officers acting reasonably and without prior knowledge of Fourth Amendment violations used in obtaining later executed arrest warrant)).

The defendant relies on **Arizona v. Evans**, which attributed the erroneous arrest to a court employee's failure to correct the computer database to reflect an arrest warrant had been quashed. The defendant contends the arrest in this case was not due to a mistake by a clerical employee, but by a police officer. The defendant further argues the exclusionary rules should be applied to deter such police misconduct, the type of misconduct associated with arresting a person without a warrant. **See** Filing No. 59 p. 15-16.

Here, there is no evidence the officers acted in any manner other than with good faith. The officers in New York started surveillance with the intent to execute an arrest warrant and a search warrant simultaneously. The officers waited for most of the day. The officers in New York relied upon a communication with the Nebraska officer, who was involved in the Nebraska end of the investigation of the defendant, for information about when the arrest warrant had been issued. The officers in New York understood the arrest warrant had been issued by approximately 3:00 p.m. (EST), but continued surveillance to await issuance of the search warrant. However, when the defendant approached the officer for a second time, the officer, thinking an arrest warrant had been issued, decided it was necessary to make the arrest at 3:45 p.m. The officers relied on the assumption the

10

arrest warrant was issued, not by a magistrate judge, but after the defendant had been indicted by a grand jury. In fact, the grand jury did determine probable cause existed to indict the defendant, however, the indictment was not returned for nearly an hour and a half. Under the circumstances, the court finds the officers who arrested the defendant did so with probable cause, or in the alternative, reasonably relied upon the later-issued arrest warrant at 3:45 p.m. (EST). Accordingly, the **Leon** good faith exception would allow the admissibility of evidence in this case.

### B. Search of 1 Oak Ridge Court, Pomona, New York

Stevenson urges the suppression of evidence seized from his residence at 1 Oak Ridge Court, Pomona, New York, on June 21, 2006, as being conducted without a warrant and without a valid voluntary consent by Stevenson. There is no question that a search warrant was being considered by the task force team, no search warrant was issued as the task force team relied upon Stevenson's consent to search. Further, there is no question that Stevenson gave his permission to search his residence at 1 Oak Ridge Court orally and in writing. The only issue is whether Stevenson's permission, i.e., his consent to search, was voluntary.

"A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." **United States v. Morris**, 910 F. Supp. 1428, 1446 (N.D. Iowa 1995) (internal citations omitted). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." **Ohio v. Robinette,** 519 U.S. 33, 40 (1996). Some characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his **Miranda** rights, and whether an individual had experienced prior arrests. **United States v. Hathcock**, 103 F.3d 715, 719-20 (8th Cir.), **cert. denied**,117 S. Ct. 2528 (1997). The court can also look at the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent

occurred in a public or secluded place; and whether the individual stood by silently while the search occurred.  *Id.*

Stevenson asserts he was threatened with the destruction of his property, the arrest of his wife, and the removal of his children if he did not give the officers permission to search and the officers had to obtain a search warrant.  The court has found those assertions are not credible in light of the testimony of all of the witnesses.  Stevenson was read his *Miranda* rights immediately after he was arrested.  Stevenson has had previous experience with the criminal justice system by being arrested and convicted of criminal charges.  He is a middle-aged college-educated man who is an experienced entrepreneur.  In addition to his oral permission to search, Stevenson also provided his written permission to search.  Stevenson's equivocal testimony of exactly what kind of document or paper he signed is not credible.

### C. Stevenson's Statements

Stevenson asserts his statements provided to task force officers in the minivan after his arrest and before and during the search at 1 Oak Ridge Court and at the task force's field office in New York should be suppressed.  Stevenson claims such statements were not voluntary or were tainted by his illegal arrest and by the illegal search of his residence.

The touchstone for the admissibility of a defendant's statements is voluntariness.  *Brown v. Mississippi*, 297 U.S. 278 (1936).  The court must look to the totality of circumstances in determining whether or not the statements were voluntary.  *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  In this case, Stevenson was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  There is no evidence Stevenson did not understand the advice of rights based upon the officers' testimony, the testimony of Stevenson, or on Stevenson's character or abilities.

Even though Stevenson was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity.  Coercive police conduct will render a confession inadmissible.  *Blackburn v. Alabama*, 361 U.S. 199 (1960).  In determining whether a defendant made statements voluntarily, the court

must determine if the accused was coerced or his will was overborne. ***United States v. Wilson***, 787 F.2d 375, 380-81 (8th Cir.), **cert. denied**, 479 U.S. 857 (1986). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. ***Schneckloth***, 412 U.S. at 225-26. Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. ***Connelly***, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. **See *Oregon v. Mathiason***, 429 U.S. 492, 495 (1977).

Considering the totality of circumstances, the court finds Stevenson to have voluntarily waived his ***Miranda*** rights and that his statements made to the task force officers following his arrest and while in the minivan prior to and during the search of the residence were made voluntarily.

Stevenson's statements made to the task force officers at the task force field office while being questioned by Agent Knight and Deputy Manak were made following a rereading of ***Miranda*** rights and Stevenson's written acknowledgment of those rights. The court finds Stevenson's statements to have been made voluntarily.

Furthermore, Stevenson's statements made at the task force field office were made after the warrant for his arrest was actually issued by the District of Nebraska. Even, assuming *arguendo*, the initial arrest in Pomona and the search of 1 Oak Ridge Court, and the statements made by Stevenson in the minivan were excluded, the statements made in the task force field office were sufficiently attenuated to purge such statements of any such taint. The temporal proximity between the alleged illegalities and the making of the ***Miranda*** advised, the presence of intervening circumstances, and the absence of flagrant police misconduct were sufficient to purge such statements of any taint. **See *United States v. Herrera-Gonzalez***, 474 F.3d 1105, 1111 (8th Cir. 2007); ***United States v. Ramos***, 42 F.3d 1160, 1164 (8th Cir. 1994).

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Stevenson's motion to suppress (Filing No. 37) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 27th day of February, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge